MAPLEWOOD POULTRY COMPANY
*vs.*
MAINE EMPLOYMENT SECURITY COMMISSION

Waldo.   Opinion, February 9, 1956.

*Brann and Isaacson,* for petitioner.

*William D. Hathaway,* for M.E.S.C.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, TAPLEY, CLARKE, JJ.

BELIVEAU, J.   On agreed statement of facts.   The petitioner was assessed for Employment Security contributions for the years 1950 to 1953 inclusive. These assessments were appealed to the Maine Employment Security Commission and after hearing upheld by that body. The petitioner filed a petition for review, addressed to the Superior Court for the County of Waldo. At the October 1955 Term of that court, by agreement of the parties, the case was reported to this court on agreed statement of facts, we "to render such judgment as the law and the evidence requires."

The petitioner during this period was engaged in the production of poultry, sold to the Maplewood Packing Company, for processing and disposition. The stockholders of these two corporations are the same.

The petitioner owns a few poultry farms in the Belfast area where it produces hatching eggs and also raises some poultry. However, most of the poultry it produces is through the contract grower system. The petitioner's concern or interest ceases when the poultry is delivered alive to the Maplewood Packing Company.

In connection with the raising of poultry by the growers, under contract with the petitioner, many services are supplied by the petitioner, in order that the poultry raised may be of the best and highest grade.

The employees are divided into four groups. Of these four groups, we are concerned here with but three.

  (1) Service Men

  (2) Pick-up Crews

  (3) Grain Crews

The duties of these crews are well described in the defendant's brief and that we adopt by quoting it in full:

> "The service men visit the contract growers periodically in accordance with a schedule drawn up by petitioner. On these visits the service men check the following: supply of feed, grit and fuel; the use of fuel and electricity; the storage and handling of grain; the supply and condition of litter; the maintenance and state of repair of the contract grower's raising house and equipment; the conversion ratio of grain to meat; the general health and mortality of the flock; the sanitation practices and raising conditions; the maturity, weight and quality of the flock. The service men also supervise caponizing and capetting programs,

advise the farmer in regard to raising procedures and new techniques, and respond to emergency calls for sick and diseased flocks. In other words, the service men perform a general supervisory and advisory function for the petitioner in regard to the raising of poultry.

The pick-up crews drive out from petitioner's office on a regularly scheduled basis to the various farms where they gather up the chickens, load them into crates, put the crates on the trucks and drive to the Maplewood Packing Company where the crates are unloaded by employees of the packing company.

The grain crews load petitioner's trucks with grain from petitioner's warehouse in Belfast and then proceed to deliver grain to the various farms on a regularly scheduled basis. At the farm the grain crews unload the feed into the farmer's grain bin, pick up empty feed bags and return to the warehouse for more grain. Litter and sawdust are also handled by the grain crews in substantially the same manner."

The wages paid these groups, for the period mentioned earlier in this opinion, is the basis for the Commission's contention that they are subject to Employment Security contributions by the petitioner.

That part of the Employment Security law involved here is found in Section 3, Chapter 29 of the Revised Statutes, which reads as follows:

"**Sec. 3. Definitions.** As used in this chapter, unless the context clearly requires otherwise, the following words shall have the following meanings:

I. 'Agricultural labor' includes all services performed:

A. On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agri-

cultural or horticultural commodity, including the raising, shearing, feeding, caring for, training and management of livestock, bees, poultry and fur-bearing animals and wild life.

**B.** In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm.

**C.** In connection with the production or harvesting of maple syrup or maple sugar or any commodity defined as an agricultural commodity in section 15 (g) of the Federal Agricultural Marketing Act, as amended, or in connection with the raising or harvesting of mushrooms, or in connection with the hatching of poultry, or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs or waterways used exclusively for supplying and storing water for farming purposes.

**D.** In handling, planting, drying, packing, packaging, processing, freezing, grading, storing or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption.

> As used in this subsection, the term 'farm' includes stock, dairy, poultry, fruit, fur-bearing animal and truck farms, plantations, ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards."

Much is said in the respondent's brief as to the interpretation of the statutes involved here. The rule to be followed by this court has long since been established, and often reiterated, that, "If the meaning of the language is plain the Court will look no further; it is interpreted to mean exactly what it says." *Sweeney* v. *Dahl,* 140 Me. 133, 34 A. (2nd) 673 (1943) at page 676. The language of the statute is plain and there is no need or necessity for the court to look any further as it is to be interpreted to mean exactly what it says. There is nothing vague, ambiguous or uncertain about it.

In the respondent's brief it is intimated that the business conducted by the petitioner was a "business enterprise" and for that reason not covered by exemption of "agricultural labor." It purports to cite as authority the case of *Stromberg Hatchery* v. *Iowa Employment Security Com'n.,* 239 Iowa 1047, 33 N. W. (2nd) 498 (1948).

The suggestion made of a "business enterprise," in that decision, is a quote from the argument by the defendant Commission in that case which the court neither discussed nor passed upon. The plaintiff there was engaged exclusively in the business of hatching eggs, exempt under the Iowa law. The Commission advanced the argument that certain employees, not directly engaged in the hatching of eggs were not exempt. The court in its opinion ignores the commercial enterprise argument and rules that the several employees such as salesmen, office clerks, office managers and others were engaged in the business of hatching eggs and for that reason were exempt under the Iowa law.

We are not aware of any decision which labels the business of raising poultry as a "business enterprise" and for that reason subject to the provisions of the law. We are concerned here solely with the Maine Statute and no such distinction is made nor can any such intimation be found in the statutes. That position is not tenable.

Again in the respondent's brief the argument is advanced that the services "must be an integral part of farming operations performed for the farmer and not for a third person." *California Employment Com'n.* v. *Butte County Rice Growers Ass'n. et al.,* 25 Calif. (2nd) 624, 154 P. (2nd) 892 (1944).

Our law, which defines "agricultural labor," specifically includes services performed in the employ of any person. The court, in the *California* case, *supra,* held that the services performed by employees of a warehouse were not "agricultural labor" and one reason advanced was that the warehouse was a general one opened to the public.

If the law provided that such employees must be in the employ of the owner, tenant or operator of the farm then the problem involved here would be easy of solution. On the contrary, such "agricultural labor" may be performed by one "in the employ of any person."

The services performed by the several crews whose duties are briefly described in this opinion, were necessary and essential for "the raising, * * * feeding, caring for * * * and management of * * * poultry."

The facts that these services were provided by the petitioner does not change the picture in the least. It may be necessary that because of the tremendous growth of this industry in Maine, in a comparatively few years, and the necessary employment of possibly hundreds of persons, that the law should be changed to cover them. However, that

is not for this court; that duty devolves on the legislature to amend the law, if it sees fit, by what it may deem to be appropriate legislation.

*Petition granted.*

*The Respondent Commission to abate Employment Security contributions assessed against the petitioner.*