HANFORD PRODUCE CO. *v.* C. A. CLEMMONS, LUCILLE K. HOWARD AND BILL LANEY, COMMISSIONER OF LABOR

5-4016                                    412 S. W. 2d 828

Opinion delivered March 27, 1967

*Williams & Gardner,* for appellant.

*Luke Arnett,* for appellee.

J. FRED JONES, Justice. This is an appeal from a judgment of the Johnson County Circuit Court affirming an order of the Board of Review awarding unemployment compensation benefits to appellees.

The appellees, C. A. Clemmons and Lucille K. Howard, were employed by the appellant, Hanford Produce Company, at its hatchery in Clarksville, Arkansas, and as such employees, their work was confined to the hatchery where baby chicks were hatched by artificial

incubation. These employees lost their employment and filed claim for unemployment compensation benefits under the Arkansas Employment Security Act, Ark. Stat. Ann. § 81-1101 (Repl. 1960). The Administrative Commission allowed the claims, both the Board of Review and the Johnson County Circuit Court affirmed the findings and decision of the Commission, and the produce company has appealed, relying on two points for reversal:

"1. The agency and the lower court erred in holding that appellant is not exempt from Arkansas Employment Security Act under Section 81-1103 (i) (6), Ark. Stats. 1947 as amended, exempting employment in connection with raising, feeding, or management of poultry.

"2. The agency and the lower court erred in holding that appellant is not exempt from the Arkansas Employment Security Act by Section 81-1103 (0), Ark. Stats. 1947 as amended, which provides for the exemption of all employment exempt under the Federal Unemployment Compensation Tax Laws."

These two points are so closely related we consider them together.

This case and the case of *Arkansas Valley Industries, Inc.* v. *Bill Laney, Commissioner of Labor et al,* appear here at the same time, and both present the same question of law on different facts. The attorneys in both cases have favored us with excellent briefs, and have orally argued both cases together on appeal.

The appellant's hatchery is located in the city of Clarksville, Arkansas, in a building which is used for no other purpose. The appellant owns no farms, nor does it lease any farms. As a part of appellant's operation, it furnishes chickens and the feed to farmers under contract, and the farmer furnishes poultry housing, equip-

ment, provides the care for the chickens, and delivers the hatching eggs to the hatchery. Neither of the appellees performed any services on the farm.

We are called on in this case to interpret for the first time, "exempted employment" under the Arkansas Employment Security Act as it relates to agriculture as defined in Ark. Stat. Ann. § 81-1103 (i) (6) (B) (Repl. 1960) and as affected by the same statute subsection (i) (6) (0).

Ark. Stat. Ann. § 81-1103 (5) (i) defines employment as follows:

" 'Employment' means any services performed * * *." and § 81-1103 (i) (6) insofar as it relates to the problem here, is as follows:

"(6) Exempted Employment. The term 'employment' shall not include—

(A) Domestic service in a private home.

(B) Services performed in the employ of an owner or tenant operating a farm, in connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding, or management of livestock, bees or poultry, or in connection with the processing, packing or marketing of the produce of such farms as an incident to ordinary farming operations, and services performed in the ginning of cotton.
* * *

"(0) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

"Also any service or employment now exempt under terms of Federal Unemployment Compensation laws so long as the same is exempt under Federal law."

Appellant argues that it comes within the exemption under (6) (B) *supra*, but that if it is not exempt under the language of (6) (B), it is exempt under the "terms of Federal Unemployment Compensation Laws" (§ 26 U. S. C. A. 3306 (K) (1) ) as specifically provided by the state law in the second paragraph of Ark. Stat. Ann. § 81-1103 (6) (0) *supra*.

Section 26 U. S. C. A. 3306 (8) (C) defines employment as follows:

"For the purposes of this chapter, the term 'employment' means any services performed * * * except—(1) Agriculture labor (as defined in subsection (K)."

26 U. S. C. A. 3306 subsection (K) is as follows:

"(K) Agricultural labor.—For purposes of this chapter, the term 'agricultural labor' includes all service performed—

(1) on a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife."

In interpreting Ark. Stat. Ann. § 81-1103 (i) (6) (B) as related to the Federal Act, it is necessary to construe the legislative intent especially as it relates to subsection (0) of Ark. Stat. Ann. § 81-1103 (i) (6), and to do this we look to the language of the statute,

the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, contemporaneous legislative history or other appropriate matters that throw light on the matter. (*Chaney, Commissioner v. Georgia-Pacific Paper Corp.,* 237 Ark. 161, 371 S. W. 2d 843).

The Federal unemployment tax Act was passed by Congress in 1935 and imposed an excise tax on every employer of eight or more persons, the amount of three per cent of wages paid annually. Certain services or employments were exempted from the definition of "employment" within the meaning of the Act, and to encourage the various states to enact and administer their own employment security Acts, the Federal Act provided for a credit on the Federal tax of 90 per cent of any amount paid under the unemployment compensation law of a state, and provided for an annual certification by the Secretary of Labor in connection with changes permissible under the State law, to effectuate the purpose of the Federal Act.

The 1935 Federal Act provided as follows:
"* * *

(c)    The term 'employment' means any service, of whatever nature, performed within the United States by an employee for his employer, except—

(1)    Agricultural labor;

(2)    Domestic service in a private home;

(3)    Service performed as an officer or member of the crew of a vessel on the navigable waters of the United States;
* * *

(7)    Service performed in the employ of a corporation, community chest, fund or foundation, organized and operated exclusively for religious, charitaable, scientific, literary, or educational purposes, or

for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual; (8) Service performed in the employ of an employer as defined in sections 351-367 of Title 45 and service performed as an employee representative as defined in said sections."

Thus it is seen that under the Federal Act as originally enacted "agricultural labor" was exempted from the provision of the Act.

The original 1935 Federal Act did not attempt to define "agriculture labor," but authorized the making of administrative regulations and "agricultural labor" was treated under Administrative Regulation 90 until the Federal Act was amended in 1939, 26 U. S. C. A. 3306 (*Scofield, Collector of Internal Revenue* v. *Tinnin*, 171 F. 2d. 227).

There was nothing in the Federal Act that prevented a state from expanding the Social Security Program in the field of exemptions, and as a matter of fact most of the states did so.

Each of the states was anxious to obtain the full benefit of the Federal law and to keep as much of the tax money in the state as possible through the 90 per cent credit provision of the Federal Act. Consequently, many of the states enacted statutes with broader coverage and narrower exemptions than were provided in the Federal Act.

The Federal Act originally covered only employers of eight or more persons, and at the same time approximately one-half the states covered employers with fewer employees. Several states covered laborers and domestic servants, both groups exempted under the Federal Act. (*Standard Dredging Corp.* v. *Murphy*, 319 U. S. 306 at 311).

Many of the states, including Arkansas, simply adopted most of the provisions of the Federal Act, with such minor changes as were necessary to fit the economic situation of the particular state and region.

Arkansas was one of the first states to enact employment security legislation, and did so by Act 155 of the Acts of Arkansas for 1937, and in this Act, Arkansas simply followed the Federal Act and exempted "agriculture" from the provisions of the Act.

The 1937 Arkansas Act provided as follows:
"* * *

(6)   The term 'employment' shall not include—

(1)   Agricultural labor;

(2)   Domestic service in a private home;

(3)   Service performed as an officer or member of the crew of a vessel on the navigable waters of the United States;
* * *

(7)   Service performed in the employ of a corporation, community chest, fund or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual;

(8)   Service with respect to which unemployment compensation is payable under an unemployment compensation system established by an Act of Congress; Provided, that the Commissioner is hereby authorized and directed to enter into agreements with the proper agencies under such Act of Congress, which agreements shall become effective ten days after publication thereof in the manner provided in section 11 (b) of this Act for general rules, to provide reciprocal treatment to individuals who have, after acquiring potential rights to benefits under this Act, acquired rights to unemployment

compensation under such Act of Congress, or who have, after acquiring potential rights to unemployment compensation under such Act of Congress, acquired rights to benefits under the Act."

The purpose of the enactment of employment security legislation, both Federal and State, and the economic conditions it was intended to relieve, are matters well known, but are set out in the original Arkansas Act 155 of 1937 as follows:

Declaration of State Public Policy

As a guide to the interpretation and application of this Act, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this general hazard of our economic life. This can be accomplished by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment from which benefits may be paid for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this State require the enactment of this measure, under the police power of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

The Arkansas Act, Ark. Stat. Ann. § 81-1102 (Repl. 1960) specifically provides:

"* * * The legislature hereby declares its intention to provide for the carrying out of the purposes of this Act in cooperation with the appropriate agencies of other States and of the Federal Government, as part of a nationwide employment security program to secure for this State and the citizens thereof the grants and privileges available thereunder."

Most of the exemptions in the original Federal Act were because of the expense and difficulty that would be involved in the administration of the Act to the exempted employment. *Latimer et al* v. *United States,* 52 Fed. Supp. 228. So after considerable experience, Congress amended the Federal Act in 1939, and for the first time attempted to define agriculture as exempt under the original Act, as including "all services performed on a farm, in the employ of any person, . . . ." (26 U. S. C. A. 3306 (K), *supra*).

Arkansas followed close on the heels of Congress and by Act 391 of 1941 brought the State Act up to date, but this time, the Arkansas Legislature did not follow the Federal amendment, but narrowed the agricultural exemptions from just "agriculture employment" to "services performed in the employ of an owner or tenant operating a farm." (Ark. Stat. Ann. § 81-1103 (i) (6) (B), (*supra*). Whereas the Congress, by its amendment to the Federal Act, narrowed the Federal exemption to the same services performed "on a farm, in the employ of any person." The Arkansas Legislature, by its amendment, narrowed the State exemption to the same services performed "in the employ of an owner or tenant operating a farm."

We place no strained construction on the wording of the statute in holding that each activity set apart by commas in subsection (i) (6) (B) of § 81-1103 relates to services performed in the employ of an *owner or tenant operating a farm.*

The State of Maine has had considerable experience

with the problem we have here. The Supreme Court of that state had occasion to consider two cases with very similar fact situations as in the case at bar. One of the Maine cases, *Maplewood Poultry Company* v. *Maine Employment Security Division,* 121 A. 2d. 360, was decided under a statute similar to the present Federal statute, and the other case was, *C. M. T. Company* v. *Maine Employment Security Commission,* 163 A. 2d. 369, decided under the Maine statute after it had been changed by amendment similar to our own Ark. Stat. Ann. § 81-1103 (i) (6) (B).

In the Maplewood case, the Maplewood Poultry Company was engaged in the production of poultry and claimed exemption under the Maine Employment Security Act.

When this case was decided by the Maine Court, the State statute was an exact copy of the Federal Act as follows:

"I. 'Agricultural labor' includes all services performed:

"A. On a farm, *in the employ of any person,* in connection with cultivating the soil, or in connection with raising or harvesting agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training and management of livestock, bees, poultry and fur-bearing animals and wild life." (Emphasis supplied)

Although the Maine Court held this activity exempt under this particular Maine Act, the Court said:

"[1, 2] Much is said in the respondent's brief as to the interpretation of the statutes involved here. The rule to be followed by this court has long since been established, and often reiterated, that, 'If the meaning of the language is plain the Court will look

no further; it is interpreted to mean exactly what it says.' *Sweeney* v. *Dahl,* 1943, 140 Me. 133, 34 A. 2d 673, at page 676, 151 A. L. R. 356. The language of the statute is plain and there is no need or necessity for the court to look any further as it is to be interpreted to mean exactly what it says. There is nothing vague, ambiguous or uncertain about it.

\* \* \*

"Again in the respondent's brief the argument is advanced that the services 'must be an integral part of farming operations performed for the farmer and not for a third person.' *California Employment Comm'n* v. *Butte County Rice Growers Ass'n,* 1944, 25 Cal. 2d 624, 154 P. 2d 892, 898.

"Our law, which defines 'agricultural labor,' specifically includes services performed in the employ *of any person.* The court, in the California case *supra,* held that the service performed by employees of a warehouse were not 'agricultural labor' and one reason advanced was that the warehouse was a general one opened to the public.

"*If the law provided that such employees must be in the employ of the owner, tenant or operator of the farm then the problem involved here would be easy of solution.* On the contrary, such 'agricultural labor' may be performed by one 'in the employ of *any person.*' (Emphasis supplied)

"[3] The services performed by the several crews whose duties are briefly described in this opinion, were necessary and essential for the 'raising, \* \* \* feeding, caring for \* \* \* and management of \* \* \* poultry.'

"The facts that these services were provided by the petitioner does not change the picture in the least. *It may be necessary that because of the tremendous*

*growth of this industry in Maine, in a comparatively few years, and the necessary employment of possibly hundreds of persons, that the law should be changed to cover them.* However, that is not for this court; that duty devolves on the Legislature to amend the law, if it sees fit, by what it may deem to be appropriate legislation." (Emphasis supplied)

This case was decided by the Supreme Judicial Court of Maine in 1956, and Maine *did* change its statute by amendment in 1957 to read as follows:

" 'Agricultural labor' includes all services performed *on a farm in the employ of the operator of such farm,* in connection with * * * the raising of * * * poultry * * * the term 'farm' shall include * * * poultry * * * farms * * *." (Emphasis supplied)

This amended statute was construed in the C. M. T. Company case, supra. In that case, the appellant, C. M. T. Company, Inc., was engaged in the business of producing broiler chickens from the egg to the processed bird ready for the market. The company leased a hen house in which it produced about ten per cent of the eggs required in the company's operation and about 90 per cent of the hatching eggs were purchased from independent producers. The hatchery was located on a six acre tract and no other farming operations were carried on on the real property. The company owned several farms on which about ten per cent of the hatched chickens were raised to broiler size. About 90 per cent of the chicks were raised on the farms of other persons under contract with the company. There were a number of employees of appellant who operated the company's hatchery and the issue was whether or not *their* employment constituted "agricultural labor" exempt from the provisions of the Maine employment security law. The period covered was a part of 1958 and 1959, and in that case the Supreme Court of Maine said:

"Until an amendment was enacted in 1957, the term 'agricultural labor' was defined by the applicable portions of R. S. 1954, chapter 29, § 3, subsection (I) as including 'all services performed: A. On a farm, in the employ of any person, in connection with * * * the raisinᵣ * * * of * * * poultry. * * * C. In connection wiᵗ... * * * the hatching of poultry * * *.' "

Obviously, "hatchery" employees were not engaged in taxable employment under the express terms of this definition of "agricultural labor" which was made exempt by other provisions of the law. The 1957 amendment, however, provided a new definition of "agricultural labor," the pertinent provisions of which were:

" 'Agricultural labor' includes all services performed on a farm in the employ of the operator of such farm, in connection with * * * the raising of * * * poultry * * * the term 'farm' shall include * * * poultry * * * farms * * *.

* * *

"The legislature in 1957 could have had no other purpose than to restrict the scope of the agricultural exemption to rather narrow limits. The language employed closely limited exempt employment to services performed 'on a farm in the employ of the operator of such farm,' and quite significantly eliminates the specific exemption previously given to services in connection with the 'hatching of poultry' wherever performed. In 1956 we held that the exemption afforded by the then existing law extended to service of employees of a concern like the appellant when rendered on the farms of the contract growers. *Maplewood Poultrʸ Company* v. *Maine ESC,* 151 Maine 467, 121 A. 2ᵈ. 360.

* * *

"Whatever the legislative motivation may have been, the language of the 1957 amendment was cartainly calculated to remove many employees of the industry from the scope of the exemption. We are

satisfied that until the exemption was again broadened in 1959, the legislature intended that the words 'on a farm in the employ of the operator of such farm' should be given the somewhat restricted meaning which we have attributed to them in this opinion.''

Ark. Stat. Ann. § 81-1103 (6) (B) provides that the term ''employment'' shall not include services performed in the employ of an owner or tenant operating a farm, and we are of the opinion that the term ''employment'' under the provisions of (i) (6) (B), *supra,* does include services performed ''in the employ of any other person,'' unless exempt under some other provision of the Act.

In *Bland, Adm'r.* v. *Belle Point Lodge No.* 20, 235 Ark. 331, 359 S. W. 2d 804, we said that the concluding sentence in subsection (i) (6) (0) refers to the exemption terms of the Federal statute under which there are listed seventeen numbered paragraphs concerning exemptions. But we are of the opinion that the second paragraph of Ark. Stat. Ann. § 81-1103 (i) (6) (0), *supra,* does not nullify, broaden or change the definition of ''exempted employment'' under (i) (6) (B), *supra.*

The Arkansas Legislature had the newly amended Federal Act before it when it amended the Arkansas Act in 1941, and it designed the Arkansas Act to fit the situation in Arkansas.

The specific exemptions in the 1937 Arkansas Act were divided into separate categories numerically arranged and numbered one through eight. (Acts of Ark. 1937, Act 155).

When the Arkansas Legislature amended the Act in

1941, it divided the specific exemptions into categories alphabetically arranged from A through P, and carefully added seven categories H, I, J, K, L, M and N not designated and set apart in the original 1937 Act. (Acts of Ark. 1941, Act 391).

Paragraph 7 of the 1937 Act became paragraph 0 of the 1941 Act, and these two paragraphs remained the same in both A. 's except an additional sentence was added to subparagraph (0) in the 1941 Act as follows:

"Also any service or employment now or hereafter exempt under terms of Federal Unemployment Compensation laws so long as the same is exempt under Federal law."

The words "or hereafter" were deleted from this sentence by amendment in 1955. (Acts of Ark. 1955, Act 395).

Had the legislature intended that this sentence have the broad effect the appellant attributes to it, the 1941 Act could have been shortened considerably by simply exempting "any service or employment now exempt under terms of Federal Unemployment Compensation laws so long as the same is exempt under Federal law."

Applying to the adverb "also" its usual and customary use and meaning, as it appears in the last sentence and paragraph of subsection (i) (6) (0), it is only logical to assume that it was intended to apply to the category of exemptions to which it is attached in § 81-1103 (i) (6) (0), and was intended to exempt services performed in connection with such present or future charitable or non-profit activity conducted in Arkansas, which the legislature may have overlooked in drafting the Act and failed to sp' nifically designate and set out under subsection (0), when the same activity is exempt under the Federal statute.

Regardless of whether the second paragraph of Ark.

Stat. Ann. § 81-1103 (i) (6) (0), *supra*, relates to similar services as those enumerated in subsection (0) or relates to *any* service, including those performed in the employ of an owner or tenant operating a farm, or relates to any of the other designated exempt classifications under the Federal Act, we are of the opinion that it could only relate to such service or employment not specifically defined and specifically set out as exempt, or not exempt, in the Arkansas Act.

"Agricultural labor" as such, is no longer totally exempt under either the State or Federal law, and certainly it is our opinion that this last paragraph in subsection (0) was not intended to substitute the broad definition of agriculture labor contained in the Federal Act for the more restricted definition in the State Act. Certainly we cannot conceive of a legislative intent to very clearly limit and define by affirmative action, agricultural exemptions in subsection (i) (6) (B), *supra*, to *services performed in the employ of an owner or tenant operating a farm,* and then at the same time, and in the same Act, extend the exemption to the same services performed *on a farm in the employ of any person* in adopting by reference, the broader definition in the Federal Act by an "also" paragraph in subsection (6) (0) having to do with an exemption of services performed in the employ of a corporation, community chest, fund or foundation organized and operated for religious and other charitable purposes.

The judgment of the trial court is affirmed.

Affirmed.

FOGLEMAN and BYRD, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I respectfully dissent because I think that the majority has misconstrued Ark. Stat. Ann. § 81-1103 (i) (6). In my opinion this section exempts these employees of appellant

from the application of the Act in that their services were performed in connection with the raising, feeding or management of poultry. I submit that the section, in view of its punctuation, should not be read as the majority reads it. They construe this section as if there were no comma after the word "farm" and as if it read:

(6) Exempted employment. The term "employment" shall not include—

(A) Domestic service in a private home.

(B1) Services performed in the employ of an owner or tenant operating a farm in connection with:

(1) the cultivation of the soil;

(2) the harvesting of crops; or

(3) the raising, feeding, or management of livestock, bees or poultry; or

(4) the processing, packing or marketing of the produce of such farm as an incident to ordinary farming operations; and

(B2) Services performed in the ginning of cotton.

I submit that if the comma after the word "farm" is considered as properly used, the section should be construed as if it read:

(6) Exempted employment. The term "employment" shall not include—

(A) Domestic service in a private home.

(B) Services performed:

(1) In the employ of an owner or tenant operating a farm;

(2) In connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding or management of livestock, bees, or poultry; or

(3) In connection with the processing, packing or marketing of the produce of such farm as an incident to ordinary farming operations; and

(4) In the ginning of cotton.

I believe this to be a sensible construction, clearly in keeping with the purpose of the amendatory act which provided the present section.

I cannot help but wonder if the majority really intends to remove pecan orchards from the exemption. Perhaps even apples and peaches from orchards cannot be classified as crops. What is the status of a dairy under their construction? Milking a cow is not harvesting a crop, nor would I call it management of livestock. It cannot successfully be urged that the majority's construction is needed to limit processing, packing and marketing so that all commercial operators in this field are not exempt, because that clause contans its own limitation to those acts which "are incident to ordinary farming operations."

Their construction would also mean that occasional slack season use by a farmer of farm labor to cut timber or firewood for market, to clear land, to recover sand or gravel from his land, or to engage in other activities not unusual on a farm would make the employment subject to tax under the Employment Security Act because it was not connected with the cultivation of the soil, harvesting of crops, the raising, feeding or management of livestock, or the processing, packing or marketing of the produce of the farm as an incident to ordinary

farming, operations. I. cannot, believe that this was the intention of the General Assembly.

While this court is properly committed to the prin ciple that rules of punctuation will not be permitted to overturn the plain and obvious intent of the Legislature, as gathered from the language of the Act as a whole,[1] there is no reason why punctuation should otherwise be disregarded. It has been said by this court that in cases of doubtful interpretation, the punctuation may be looked to as having some weight in determining the real meaning of the lawmakers. *Starett* v. *McKim,* 90 Ark. 520, 119 S. W. 824. While punctuation does not control construction, it is an aid thereto. *Gray* v. *General Construction Co.,* 158 Ark. 641, 250 S.W. 342. An Act should be read as punctuated unless there is some reason to the contrary. Horack's Sutherland, Statutory Construction (3rd Ed.) Vol. 2, § 4939. Punctuation should be given weight, unless from inspection of the whole statute it is apparent that the punctuation must be disregarded in order to arrive at the legislative intention. Crawford, Statutory Construction (1940). When there is no inconsistency, absurdity or ambiguity in a statute as officially printed and punctuated, the court will not give it a different meaning by changing the punctuation. 50 Am. Jur. 250, Statutes, § 254. Punctuation will not be disregarded unless it is necessary to do so and a clear and grammatical statute will not be changed in meaning by repunctuation. 82 C. J. S. 685, Statutes, § 341.

The majority rely upon two Maine cases, the first of which held employment similar to that of appellees exempt under an earlier statute, and the latter held it non-exempt after the Act had been amended. I have no quarrel with the holdings in those cases. A reading of the two statutes shows a very different wording. It is interesting to note that the Maine Legislature amended the Act under which the hatchery was held not to be

---

[1] See, e.g., *Koser* v. *Oliver*, 186 Ark. 567, 54 S. W. 2d 411; *Jones* v *State*, 104 Ark. 261, 149 S. W. 56.

exempt and restored the earlier statute under which it was held exempt.

My construction of the statute is in keeping with the policy of this state to promote the poultry industry in Arkansas as evidenced by the Acts of the General Assembly in granting broad exemptions from the gross receipts tax on gross receipts derived from the sale of poultry and poultry products. Section 4, Act 386 of 1941. It was provided that this exemption did not apply to chicken hatcheries until the passage of Act 15 of 1949 when this proviso was eliminated and the sale of baby chickens was exempted. Still later the General Assembly, by Act 94 of 1955, exempted all feedstuffs used in growing or producing poultry from both the gross receipts tax and the compensating tax. It was also admitted in oral argument that the tax had never before been collected by the Employment Security Division in situations such as those presented here. Administrative construction of a statute is entitled to consideration and is highly persuasive. *Brawley School Dist. No. 38* v. *Kight,* 206 Ark. 87, 173 S. W. 2d 125; *Moses* v. *McLeod,* 207 Ark. 252, 180 S. W. 2d 110. Official conduct long pursued will be given great weight. *Adams* v. *Hale,* 213 Ark. 589, 212 S. W. 2d 330.

I agree with the majority that no exemption can be based upon Ark. Stat. Ann. § 81-1103 (i) (6) (0), but for entirely different reasons which are stated in my dissenting opinion in *Arkansas Valley Industries, Inc.* v. *Bill Laney, Commissioner of Labor, et al,* 242 Ark. 261, 412 S. W. 2d 817, handed down on this date.

I would reverse the judgment of the circuit court, the Board of Review and the Appeals Referee.

I am authorized to state that Mr. Justice Byrd joins in this dissent.